UNITED STATES v. DELAWARE, L. & W. R. CO.

(District Court, N. D. New York. February 15, 1915.)

1. CARRIERS ☞37—CARRIAGE OF LIVE STOCK—ACTIONS FOR PENALTIES—EVIDENCE.

Under Act June 29, 1906, c. 3594, 34 Stat. 607 (U. S. Comp. St. 1913, §§ 8651–8654), prohibiting carriers from confining animals in cars, boats, or vessels for longer than 28 consecutive hours, or 36 hours on request of the owner or person in custody of such animals, without unloading them for rest, water, and feeding for the period of at least 5 consecutive hours, where in an action for penalties it was stipulated that defendant received a shipment of horses from a connecting carrier after they had been confined without unloading them for 44½ hours, that 2½ hours elapsed thereafter before they were unloaded at defendant's nearest unloading point, that the actual running time between the point where the car was

---

☞For other cases see same topic &.KEY-NUMBER in all Key-Numbered Digests & Indexes

received and such unloading point was 1 hour and 5 minutes, that the movement of the car to the unloading point was through an exceedingly busy and active railroad yard, and that the maximum temperature on that day was 40 degrees, the minimum temperature 23 degrees, and the mean temperature 32 degrees, but the probable or approximate time necessarily used up by reason of weather or switching did not appear, defendant did not sustain the burden of showing that it exercised diligence and acted with reasonable promptness in moving the car to the unloading point and commencing unloading, as the court could not find without evidence that 1 hour and 25 minutes was necessarily used in switching operations and movements, or in such movements interfered with and delayed by weather conditions.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95, 927; Dec. Dig. ☞37.]

2. CARRIERS ☞37—CARRIAGE OF LIVE STOCK—CONFINEMENT—LIABILITY.

A railroad company, which received a shipment of horses after they had already been confined without unloading for food, water, and rest for a period in excess of that permitted by the Twenty-Eight Hour Law, was bound to exercise diligence and to act with reasonable promptness in moving the car to its nearest unloading point and in commencing the unloading.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95, 927; Dec. Dig. ☞37.]

3. CARRIERS ☞37—CARRIAGE OF LIVE STOCK—ACTIONS FOR PENALTIES—BURDEN OF PROOF.

In an action for a penalty for the violation of the Twenty-Eight Hour Law by a railroad company, which received from a connecting carrier a shipment of horses already confined without food, water, and rest for a longer period than that permitted by the statute, the burden was upon it to show that it exercised diligence and acted with reasonable promptness in moving the car to its nearest unloading point and in commencing unloading.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95, 927; Dec. Dig. ☞37.]

4. CARRIERS ☞37—CARRIAGE OF LIVE STOCK—CONFINEMENT—LIABILITY.

Under the Twenty-Eight Hour Law, where a carrier unloaded a shipment of horses which had been confined without food, water, and rest for 44½ hours, and after 3 hours reloaded them and forwarded them to their destination, there was a new violation of the statute, though it required only 3 hours to reach their destination and they were then immediately unloaded, and though the owners of the horses consented to such reloading, as the statute requires an unloading and rest of at least 5 hours, and the consent of the owners cannot nullify the statute.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95, 927; Dec. Dig. ☞37.]

5. CARRIERS ☞37—CARRIAGE OF LIVE STOCK—CONFINEMENT—LIABILITY.

While it is not a defense to an action for a penalty under the Twenty-Eight Hour Law that a carrier has instructed its employés to comply strictly with such law, such instructions will bear on the amount of the penalty which the court should impose.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95–927; Dec. Dig. ☞37.]

6. CARRIERS ☞37—CARRIAGE OF LIVE STOCK—VIOLATIONS—AMOUNT OF PENALTY.

Where, after a carrier received from a connecting carrier a shipment of horses which had been confined without food, water, and rest for 44½ hours, there was a delay of 2½ hours before they were unloaded, and after only 3 hours they were reloaded and forwarded to their destination.

and it did not appear that the carrier had instructed its employés to comply with the statute, though there was no intentional violation of the statute, there was such negligence as called for the imposition of more than the minimum penalty for the second violation, and a penalty of $200 would be imposed.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95, 927; Dec. Dig. ☞37.]

Action by the United States against the Delaware, Lackawanna & Western Railroad Company, to recover penalties for an alleged violation of the Twenty-Eight Hour Law, so called. Judgment for the United States.

John H. Gleason, U. S. Atty., of Albany, N. Y., and Thos. H. Dowd, Asst. U. S. Atty., of Cortland, N. Y., for the United States.

F. W. Thomson, of Syracuse, N. Y., and W. S. Jenney, of New York City, for defendant.

RAY, District Judge. [1] The facts in this have been stipulated as follows:

"1. That a car loaded with 20 horses, consigned to the order of the Winters & Prophet Canning Company, at the village of Mt. Morris, N. Y., by a consignor named Omer Van Winkle, of the city of Anderson, Ind., was delivered by the Cleveland, Cincinnati, Chicago & St. Louis Railroad Company, as initial carrier, and the Lake Shore & Michigan Southern Railway Company, as connecting carrier, on December 18, 1910, to the defendant, the Delaware, Lackawanna & Western Railroad Company, at Buffalo, N. Y.

"2. That said car was delivered as aforesaid and was received by the defendant upon a side track which is called an 'interchange track,' and which is a track set apart for the common use of both said Lake Shore & Michigan Southern Railway Company and the defendant company to accomplish the interchange of through traffic.

"3. That said car was delivered as aforesaid to the defendant company at 12:30 o'clock in the afternoon of December 18, 1910.

"4. That in making said delivery as aforesaid the Lake Shore & Michigan Southern Railway Company also delivered to the defendant company a waybill showing destination, route, etc., of said car, and also showing, by a statement indorsed thereon, that said horses had been loaded at 4 p. m., on December 16, 1910, at Anderson, Ind., and also showing, by a statement indorsed thereon, that said horses had been fed and watered in transit, between Anderson, Ind., and Buffalo, N. Y.

"5. That at the time defendant received said car as aforesaid said horses had been already confined by the Cleveland, Cincinnati, Chicago & St. Louis Railroad Company, the initial carrier thereof, and the Lake Shore & Michigan Southern Railway Company, the connecting carrier, in a railroad car without unloading them for food and water and for rest, in violation of law, for a period of 44½ hours.

"6. That the horses in said car were accompanied by the consignor thereof and were subject to the 36-hour period under said law, and the Cleveland, Cincinnati, Chicago & St. Louis Railroad Company and the Lake Shore & Michigan Southern Railway Company had exceeded said period by 8½ hours.

"7. That when delivery of said car was tendered to defendant by its connecting carrier, the Lake Shore & Michigan Southern Railway Company, upon said interchange track, under the conditions as aforesaid, there were but two courses for this defendant to follow: One course was to refuse to accept the said car, which would have compelled its said connecting carrier, the Lake Shore & Michigan Southern Railway Company, to haul said car back on its own line to its nearest stockyard for unloading said horses; and the other course was to accept the car and assume the duty of hauling said car with

reasonable promptness, under all the circumstances, to its own nearest stock-yard for unloading.

"8. That this defendant company accepted the car and thereby accepted whatever responsibilities and duties in relation thereto which, under the circumstances then present, were placed upon defendant by the federal statute regulating the transportation of live stock.

"9. That said car was delivered to the defendant at 12:30 o'clock in the afternoon of December 18, 1910, by the Lake Shore & Michigan Southern Railway Company, as connecting carrier, at the said interchange track in Buffalo, and defendant took said car from said interchange track in the afternoon of said date, and moved it to East Buffalo stockyard, defendant's nearest facility for unloading, where the horses were unloaded for food, water, and rest at 3 p. m. on December 18, 1910.

"10. That between the time of delivery of said car to the defendant company by its immediate connecting carrier on said exchange track and the time when defendant unloaded the horses as aforesaid 2½ hours elapsed.

"11. That said haul from the interchange tracks to the stockyards of the terminal, was a movement through an exceedingly busy and active railroad yard.

"12. That defendant did not carry said car from the interchange tracks in any main line movement towards destination prior to unloading. That said car was handled in a separate movement from the said interchange track to said stockyards by a yard engine.

"13. That the actual running time of the car from Buffalo to East Buffalo, exclusive of the necessary switching movement, was 1 hour and 5 minutes.

"14. That the maximum temperature on said December 18, 1910, was 40 degrees, the minimum temperature 23 degrees, and the mean temperature was 32 degrees.

"15. That no penalty has been collected from the Cleveland, Cincinnati, Chicago & St. Louis Railroad Company, nor the Lake Shore & Michigan Southern Railway Company on account of the handling of said car by them or either of them, and no action for such purpose has been brought.

"16. That after said horses had been fed, watered, and rested from 3 p. m. on December 18, 1910, until 6 p. m. on the same day, said horses were, at the request of the consignor thereof and attendant, Omer Van Winkle, reloaded and forwarded from East Buffalo on December 18, 1910, at 6:45 p. m., easterly to their destination at Mt. Morris, N. Y., a distance of 57 miles, where they arrived at 9:45 p. m. on said December 18, 1910, and they were immediately unloaded.

"17. That the defendant is a corporation organized under the laws of Pennsylvania."

This car load of horses came to the defendant, Delaware, Lackawanna & Western Railroad Company, after the horses contained therein had been confined without rest, food, or water for 8½ hours in excess of the statutory period of 36 hours, to which provision of the law it was subject, and of this fact the defendant company had knowledge. If, therefore, the defendant company had moved the car forward towards its destination without first unloading for the statutory time, it would have made itself a party to the illegal confinement, and would be liable to the penalty imposed by law. However, it did not do this, but after the lapse of 2½ hours actually unloaded the horses at its nearest point for performing this service for rest, food, and water.

From the thirteenth conceded fact it appears:

"That the actual running time of the car from Buffalo (where it was received by the defendant) to East Buffalo (which was the defendant's nearest unloading point), exclusive of the necessary switching movement, was 1 hour and 5 minutes."

How much time for the necessary switching movement or movements of this car in transferring it to the unloading point was reasonably necessary does not appear. It also is conceded and stipulated:

"That said haul from the interchange tracks (where the car was received) to the stockyards of the terminal (unloading point) was a movement through an exceedingly busy and active railroad yard."

It is also stipulated and conceded:

"That the maximum temperature on said December 18, 1910 (the day in question) was 40 degrees, the minimum temperature 23 degrees, and the mean temperature was 32 degrees."

Deducting the actual running time from the receiving point to the unloading point, 1 hour and 5 minutes, from the time unloading was delayed, we have 1 hour and 25 minutes' delay unaccounted for, except that the temperature may have had some influence and switching operations may have had, and probably did have, something to do with this delay of about 1½ hours in the unloading. However, there is neither stipulation nor evidence showing the probable or approximate time necessarily used up by reason of weather or switching. The distance from the receiving point to the unloading point is not given, but the running time is. I do not think the court can find, without evidence, that 1 hour and 25 minutes 'was necessarily used in switching operations and movements, or in such movements interfered with and delayed by weather conditions.

[2, 3] It was the duty of the defendant, on receiving this car of horses, in view of the violation of the statute which already had been committed by the connecting lines, to exercise diligence and act with reasonable promptness in moving the car to the unloading point and commencing the unloading. The burden of showing the exercise of such diligence, and that prompt movements, including switching operations, were made, was on this defendant. This court cannot surmise, guess, or speculate that there was a necessary delay of 1 hour and 25 minutes in switching under prevailing weather conditions. The movement of this car was through "an exceedingly busy and active railroad yard"; but this is no excuse, in the absence of some breakdown or blockade which active care and precaution could not have foreseen and provided against. This court has already, in another case, held that the movement of ordinary freight and passenger cars in such yards must give way to the movement of cars loaded with horses, cattle, etc., under such conditions. For anything that appears to the contrary, the defendant's employés took their time in moving this car load of horses, and permitted it to await its turn with cars of ordinary freight, regardless of the fact that the animals had already been confined without rest, food, or water for more than the time permitted by law. It does not appear that this fact of unlawful confinement was brought to the attention of those engaged in moving this car, or any of the cars, or that diligence and promptness in moving this car, or in unloading, was enjoined upon them. This court does not think there was a purpose to evade, on the part of the defendant, or violate, the law; but the delay was known, and, so far

as appears, willful, on the part of defendant's employés for whose acts in this matter the defendant is, of course, answerable.

[4, 5] From the sixteenth stipulated finding of fact it appears that after such horses had been unloaded and fed and watered and rested on said day from 3 p. m. to 6 p. m., a period of 3 hours only, they were at the request and with the approval of the consignor and the attendant on such horses, one Omer Van Winkle, reloaded and at 6:45 p. m. forwarded easterly to their destination at Mt. Morris, N. Y., a distance of only 57 miles from East Buffalo, where they arrived at 9:45 p. m. the same evening, and were then immediately unloaded. Here was a plain violation of the statute, a separate and distinct violation, and the request and consent of the consignor and attendant is no excuse or defense. The statute requires an unloading and a rest of at least 5 hours before reloading; and it is not a question of the extent and duration of the suffering, if any, of the horses, except as it bears on the amount of the penalty that should be imposed. By such reloading in violation of law the penalty was incurred. The consent of owners and consignors of cattle, horses, etc., cannot be permitted to nullify the plain provision of the statute. I think railroad corporations should enjoin upon their employés, and enforce, a strict compliance with the law. Here it does not affirmatively appear that the employés of defendant engaged in moving this car, or cars, similarly loaded, had received any instruction the one way or the other; but I am of opinion that defendant would have called the attention of the court to the fact, had any instruction been given. Of course, instructions in this regard, and a violation thereof by employés, would not be a defense; but it would bear on the question of amount of penalty the court should impose.

[6] I am of opinion that, while there was no intentional violation of the statute on the part of the defendant company or its officers, there was such negligence as calls on the court to impose for the second violation in reloading after 3 hours' rest only more than the minimum penalty. There will be a judgment for the plaintiff of $100 for the first-mentioned violation, and for $200 for the second violation, and for costs. The acts themselves were knowingly and willfully done, and hence the defendant knowingly and willfully failed to comply with the provisions of the act of June 29, 1906 (34 Stat. 607, 608, U. S. Comp. St. 1913, §§ 8651, 8652, 8653).

Judgment is directed accordingly.